**Albino PEREZ, Petitioner,**

v.

**Terry ROSARIO, Warden, Respondent.**

**No. C 02–05237 WHA.**

United States District Court,
N.D. California.

Nov. 24, 2003.

Christopher William Grove, Attorney General Office of California, San Francisco, CA, for Terry Rosario.

Kent A. Russell, Russell and Russell, San Francisco, CA, for Albino Perez.

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

ALSUP, District Judge.

### INTRODUCTION

Petitioner Albino Perez is in state prison serving 47 years to life for multiple convic-

tions related to an assault with a semi-automatic weapon. He was sentenced under California's "three strikes" law as a repeat felon. Petitioner filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. 2254 alleging ineffective assistance of counsel and the denial of his right of confrontation. This order holds that petitioner is not entitled to federal habeas relief.

## STATEMENT

Petitioner is in the custody of the California Department of Corrections. On October 7, 1996, a jury found petitioner guilty of assault with a semi-automatic firearm, assault with a deadly weapon, shooting into a motor vehicle, and two counts of possession of a firearm by a felon. The jury also found true the enhancement allegations that charged petitioner with personal use of a firearm. The victim in this case was John Hernandez, with whom petitioner had had several confrontations and physical altercations during the 1980s (RT 426–27, 437–38). On June 30, 1997, the trial court found that petitioner had three prior convictions that were "strikes" and serious or violent felonies. On May 22, 1998, the court sentenced petitioner to a total term of 47 years to life.

The charges against petitioner arose out of a shooting on April 16, 1995, in the Excelsior District of San Francisco. At about 7:00 or 7:30 p.m., John Hernandez picked up some groceries from his fiancee's mother's house on Pope Street. As Hernandez pulled his Honda Prelude out of the driveway, he saw a dark-colored BMW with two occupants drive slowly past him through the intersection of Pope and Brunswick Streets (RT 450–52). Hernandez proceeded onto Brunswick where the BMW had slowed to a stop before reaching the next intersection with Allison Street (RT 456–57). To continue along Brunswick, Hernandez pulled up beside the BMW to drive around it (RT 457). Hernandez recognized petitioner as the driver and noticed that petitioner was wearing a blue knit cap (RT 459–60). He made eye contact with petitioner and asked him "What's the problem" and "What's up" (RT 460–61). Petitioner pulled out a black semi-automatic weapon (RT 461). When Hernandez saw the gun, he sped away (RT 463–64). He heard about seven shots fired (RT 464, 470). Hernandez called the police (RT 471). He later realized that his right rear tire had been blown out and that there were bullet holes in his car (RT 466, 471–73).

In response to Hernandez's call, the police searched the area surrounding Pope and Brunswick Streets and found ten-millimeter shell casings on the street and a ten-millimeter bullet in a nearby house (RT 326–27, 329, 551–53). Three officers went to petitioner's house looking for a dark BMW but did not find one (RT 864–65, 1388–89, 1439–40). This fact contradicts a key contention made in petitioner's alibi theory, as discussed below.

On April 18, 1995, Officer Williams saw petitioner enter petitioner's house, which was under surveillance (RT 570–72). A dark-blue BMW was parked in front of petitioner's home (RT 572–73). Officer Williams called and waited for back-up and then entered through the front of the house (RT 574). Officer Marchand entered petitioner's backyard (RT 644–45). He saw petitioner throw an assault rifle out of a rear window, which the officer recovered (RT 645, 648–49). Petitioner was arrested and the police executed a search of the premises. A ten-millimeter bullet was found next to petitioner's bed as well as a blue knit cap (RT 634, 887–89). The keys to petitioner's BMW were seized from his pants pocket (RT 582–83, 585–86). Officer Williams started the car but was unable to put the clutch into gear so the car was towed away (RT 586–87).

Inspector Suyehiro of the San Francisco Police Department inspected the BMW on April 20, 1995 (RT 815–17). He tested the driver's side door for gun-powder residue (RT 817). Several particles consistent with gunshot residue were discovered on both the outside and inside of the driver's side door (RT 1019). Hernandez's Honda Prelude was examined as well (RT 805–06). Inspector Suyehiro discovered bullet holes in the right rear tire and its wheel well. He also found a bullet indentation in the right rear running board (RT 807–08). A bullet was also found lodged in the rear seat (RT 808–09). James Norris, a criminalist, examined the bullets recovered from Hernandez's car and the bullet and casings found by the police at the scene of the crime (RT 751). The bullets were consistent with the casings recovered by the police. They were also consistent with being fired from the same weapon (RT 761–62). The markings on the ten-millimeter bullet found in petitioner's bedroom were similar to the markings on the casings recovered at the scene (RT 775–76, 781–83).

Based on the foregoing, an information was filed against petitioner on July 25, 1995, charging him with assault and other related offenses (CT 1–6).

\* \* \* \* \* \*

A jury trial commenced September 17, 1996. Petitioner relied on an alibi defense and presented evidence that he was taking his girlfriend home on the bus at the time of the incident. The defense called Juan Tomasino, a neighbor and friend of petitioner, who testified that he owned the BMW parked in petitioner's driveway (RT 1109). The car, according to Tomasino, did not run; it had a bad clutch and electrical problems (RT 1110, 1113–15). Tomasino testified that he had pushed the car to petitioner's house on April 1, 1995, so petitioner could try to repair the electrical damage (RT 1113).

Petitioner's stepfather, mother, and one of his sisters all testified that petitioner was working on the BMW in the early morning hours of April 16, 1995 (RT 1172–75, 1193, 1307). That day was Easter Sunday and to celebrate petitioner and his family had planned a large barbecue party at the house they all shared. Petitioner's girlfriend, Patricia Palma, testified that she left the party with petitioner and her seven-year-old son between 6:00 and 6:30 in the evening (RT 1289). They rode the bus together to Palma's house (*ibid.*), because petitioner's sister had refused to allow petitioner to borrow her car to drive Palma home (RT 1197–98).

Joseph Morello also testified. He said that on April 16, 1995, he was walking toward the intersection of Pope and Brunswick Streets to meet a friend when he saw a BMW containing two Asian men pass him on Brunswick (RT 1338–39). One of the men was wearing a beanie-type hat, the other a baseball cap (RT 1339). He then saw a Honda Prelude quickly back out of a driveway on Pope and speed off in the direction of the BMW on Brunswick (RT 1340). Moments later, Morello heard gunshots about a block or two away (RT 1340–41).

\* \* \* \* \* \*

Petitioner was found guilty of all charges on October 7, 1996. Petitioner appealed his conviction to the California Court of Appeal for the First District, which affirmed in an unpublished opinion April 23, 2001. On the same day, the court summarily denied petitioner's petition for state habeas relief. The California Supreme Court denied review on August 8, 2001. Petitioner filed a federal petition for writ of habeas corpus in this Court on October 29, 2002. On February 7, 2003, respondent was ordered to show cause why a writ should not issue.

## ANALYSIS

### 1. STANDARD FOR HABEAS CORPUS REVIEW.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. 2254, applies to petitioner's case. Under AEDPA, an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a state court shall not be granted with respect to any claim already adjudicated on the merits in state-court proceedings unless the adjudication of that claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. 28 U.S.C. 2254(d).

■■■■ As used in AEDPA, "contrary to" and "involve an unreasonable application of" clearly established federal law have distinct meanings, though they may also overlap. A state court's decision is contrary to federal law if it fails to apply the correct controlling authority or if it applies the correct controlling authority incorrectly to a case involving facts "materially indistinguishable" from those in the controlling decision. A state court's decision involves an unreasonable application of federal law if it correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or if it extends or fails to extend a clearly-established legal principle to a new context in a way that is objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 405–12, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Unreasonable" is not the same as incorrect. Instead, it is comparable to the "clear error" standard—*i.e.*, reversal is allowable only where the reviewing court is left with a "firm convic-

tion" that error has been committed. *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir.2000). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." 28 U.S.C. 2254(e)(1).

### 2. CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner identifies six omissions by defense counsel that petitioner contends deprived him of effective assistance of counsel. Petitioner claims that counsel failed to: (1) sufficiently develop petitioner's alibi theory; (2) establish that another person committed the assault; (3) establish that another person was driving a BMW similar to petitioner's BMW in the neighborhood at the time of the assault; (4) obtain petitioner's informed consent not to testify; (5) inform petitioner that his case was a three-strikes case; and (6) gather and present evidence in support of two motions for new trial that substitute counsel later submitted in support of a third new-trial motion. Petitioner further argues that the omissions of defense counsel in the aggregate deprived him of effective assistance of counsel even if no single omission did so.

The witness declarations appended to petitioner's federal habeas filing were also appended to his state habeas petition. In this case, petitioner did not submit a declaration of defense counsel to shed light on counsel's decisions at trial. Petitioner attempted to obtain said declaration but claims that defense counsel did not have adequate time to review and respond to the claims of ineffective assistance alleged (Pet.Exhs.65–66).

### A. Legal Standard for Ineffective Assistance of Counsel Claims.

■■■■ Petitioner's claim of ineffective assistance of counsel is governed by the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052,

80 L.Ed.2d 674 (1984). A successful claim of ineffective assistance of counsel has two components. First, "the [petitioner] must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Second, the petitioner must show that counsel's errors were so serious as to deprive him of a fair trial. *Id.* at 691–94, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance must be highly deferential and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. The petitioner bears the burden of overcoming the presumption that counsel's actions were in accordance with sound trial strategies. *Id.* at 690, 104 S.Ct. 2052. Furthermore, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, a court need not analyze whether counsel's action was reasonable. *Id.* at 698, 104 S.Ct. 2052.

### B. Failure to Sufficiently Develop Petitioner's Alibi Defense.

■ Petitioner asserts that defense counsel was ineffective because, although he put on some alibi evidence, he failed to adequately establish petitioner's alibi defense by presenting additional evidence. Petitioner first claims that defense counsel's direct examination of petitioner's girlfriend, Patricia Palma, was inadequate. Petitioner points to Palma's two declarations prepared and submitted *after* petitioner was convicted to demonstrate that Palma had more information that could have been used to substantiate his alibi defense.[1]

According to Palma, she was with petitioner from 12:30 in the afternoon to between 8:00 or 8:30 in the evening on April 16, 1995 (Pet.Exh. 26). That day, as mentioned, was Easter Sunday. She attended the barbecue party at petitioner's house with her son. At about 6:30 p.m., Palma, together with her son and petitioner, left the party and walked to a local Burger King on Mission and Russia Streets to have a cup of coffee and await a bus to Palma's house (*ibid.*). They left Burger King at about 7:15 p.m. and walked across Mission Street to catch the bus (*ibid.*). When they reached her house, Palma and petitioner stayed outside on the steps and talked for "just under an hour" (*ibid.*).

The state appeals court ruled that Palma's post-trial recollection of events lacked credibility. It stated that:

> In his declaration in support of his petition for writ of habeas corpus, [petitioner] suggests that Palma could have testified with more specificity as to the events of the evening of April 16, 1995. Yet, in her testimony at trial, Palma did testify that she and [petitioner] left his house at 6:00 or 6:30 p.m. and that he took her home on the bus but she could not elaborate on how long it took them to get to her house or what time he left. Her declaration submitted in support [of] the petition for writ of habeas corpus in which [she] states that she left the party at 6:30 p.m. and that [petitioner] was with her until 8:00 or 8:30 p.m. thus lacks credibility. It is inconceivable that her memory of the events on December 27, 1997, and June 2, 1999, several years after the incident, was better than her memory at trial where she testified that she could not say what time [petitioner] left her and that she was "not sure of exact times. . . ."

(Opin.14–15).

This order finds that the state appeals court's rejection of Palma's declarations

---

1. The first Palma declaration, dated December 27, 1997, and the second declaration, dated June 2, 1999, both provide a clearer timeline of petitioner's whereabouts on the day of the shooting.

was not unreasonable. Palma testified at trial on September 30, 1996, approximately 18 months after the shooting. Both the prosecutor and defense counsel asked Palma questions as to petitioner's whereabouts on April 16, 1995. Defense counsel was able to establish on direct examination that petitioner left the party with Palma at about 6:30 p.m., and that they took the bus together to Palma's house:

Defense: At some point did you leave [the party]?

Palma: Yes.

Defense: About what time was that to your memory?

Palma: Rough estimate six, 6:30.

Defense: Had you spent the afternoon there, finished eating, things like that?

Palma: Yes.

Defense: Okay. When you left where did you go?

Palma: We went to the bus stop.

Defense: Where is that?

Palma: On Mission and Russia.

Defense: And how did you get to the bus stop?

Palma: We walked.

\* \* \* \* \* \*

Defense: When you went to get the bus was [your son] Eric with you?

Palma: Yes, he was.

Defense: Was [petitioner] with you?

Palma: Yes, he was.

Defense: Did you and Eric and [petitioner] take the bus from Russia and Mission home?

Palma: Yes, we did.

(RT 1289–90). Significantly, Palma made no mention of stopping at Burger King and having a coffee while waiting for the bus. She testified that she walked with her son and petitioner directly to the bus stop on Russia and Mission Streets. Furthermore, she could not recall specific times. The prosecutor on cross-examination tried to have Palma clarify the timing of the events:

Prosecution: Ms. Palma, you said you left [petitioner's] home between six and 6:30, is that right?

Palma: Yes, I did.

Prosecution: Okay. And you got home on the Mission, on the bus that runs along Mission Street?

Palma: Yes, I did.

Prosecution: How long did it take you to get home on that night?

Palma: You know, I really can't be exact at times because it's really hard. Each stop and the buses are like, you know. But I could say it took probably about, well, we had to wait for the bus, first of all, and then when the bus got there then it probably took about maybe, maybe about 30 or 45 minutes. That's like I said a rough estimate because I can't give you an exact time.

\* \* \* \* \* \*

Prosecution: I'm trying to clarify that you said 30 to 45 minutes, was that how long it took you to get home from Athens?

Palma: Excuse me. I'm not even giving you because I can't tell you, but I'm telling you I'm thinking if I was to be over there at that bus stop and getting home that's just an average time it would take to get there. But I can't tell you really. For me to tell you my word is no good on that.

Prosecution: Okay. Do you have any idea of times at all?

Palma: No, I'm just guessing if you were at the bus stop and you were waiting how long it would take you or anybody, you know.

\* \* \* \* \* \*

Prosecution: You're really not sure of what time you got to your house after

leaving the party on April 16, 1995, you're really not sure what time it was [petitioner] left your house on that night, isn't that true?

Palma: I'm sure that I'm sure around the times that he was there. But I'm sure that he was with me in between those times and, I mean, you know, exact times, no, I'm not sure of exact times, no.

(RT 1292–93, 1302).

This order finds that Palma had every opportunity at trial to substantiate petitioner's alibi that they were together at the time the shooting took place. Palma, however, was unable to do so with any degree of specificity. This rendered her post-conviction declarations, both of which provided more detail, unworthy of belief. Or, at least it was not unreasonable for the state appeals court to so find.

■ Second, petitioner complains that defense counsel failed to call Jim Espinoza to testify on his behalf. The argument was rejected by the state appeals court. The facts showed that petitioner and Espinoza had not met on the night of the shooting until 9:00 p.m. This did nothing to take petitioner away from the crime scene at 7:00 or 7:30 p.m., the approximate time Hernandez was assaulted. Against this backdrop, the state appeals court reasonably found that:

Trial counsel's failure to call Jim Espinoza also does not support [petitioner's] ineffective assistance of counsel claim. Defense investigators interviewed Espinoza prior to trial. Espinoza, however, could not support [petitioner's] alibi because according to [petitioner's] version of the events, he did not meet with Espinoza until 9:00 p.m. on the evening at issue. As the shooting occurred between 7:00 and 7:30 p.m., Espinoza

would not have been able to provide any relevant alibi evidence.

(Opin.15).

■ Petitioner, however, now puts another spin on what Espinoza would have testified to as a witness. Petitioner contends that Espinoza would have testified that petitioner's BMW was inoperable on April 16, 1995, and was parked in petitioner's driveway at the time Hernandez was shot. This argument also fails. This is first a curious point given that three police officers went to petitioner's home the night of the shooting and did *not* find a BMW there. Furthermore, defense investigators interviewed Espinoza prior to trial. Espinoza did not confirm that petitioner's BMW was inoperable on the night of the shooting. He merely stated that "[t]he B.M.W. was in the driveway facing into the street" and that they had "dropped the car off at Moscow and Persia Streets" (Pet. Exh. 25). Strategic choices of counsel "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Here, the state appeals court noted that Espinoza had been interviewed prior to trial (Opin.15). Its decision to reject petitioner's claim with respect to Espinoza was consistent with *Strickland.*

■ Continuing with the same theme, petitioner contends that defense counsel failed to call additional witnesses to testify that petitioner's BMW was at his house at the time of the shooting. According to petitioner, Don Bermudez and petitioner's siblings, Arlene and David Perez, would have so testified had they been called as trial witnesses. Each signed a declaration *after* petitioner's conviction. Bermudez stated that he saw petitioner's BMW parked in petitioner's driveway at 7:30 p.m. on the evening of April 16, 1995 (Pet. Exh. 11). Arlene Perez, who lived with

petitioner, averred that she periodically checked the front of the house between 4:00 p.m. and 11:00 p.m. on April 16 and remembered "seeing the black BMW in the driveway during these periodic checks" (*id.* at 12). David Perez said that he left petitioner's home between 7:30 and 8:00 p.m. that night and saw the BMW parked in the driveway at that time (*id.* at 13).

The state appeals court did not address this particular issue. Petitioner, nonetheless, is not entitled to relief. To start, there is no evidence that defense counsel knew of Bermudez or Arlene and David Perez at the time of trial. Indeed, Bermudez stated that he was not "approached by an attorney or otherwise asked to testify on behalf of [petitioner]" until the date of his declaration, that is, December 26, 1997 (*id.* at 11).

Moreover, this order holds that this additional testimony would not have helped petitioner. At trial, defense counsel presented evidence that petitioner's BMW did not run and was parked in front of petitioner's home on the day of the shooting. Juan Tomasino testified that the BMW belonged to him and that the BMW had electrical problems and did not run (RT 1109–13). Tomasino pushed the BMW to petitioner's home on April 1, 1995, so petitioner could try to fix it (RT 1113). Petitioner's stepfather, mother, and another one of his sisters each testified that petitioner was working on the BMW in the early morning hours of Easter Sunday (RT 1174, 1194, 1308). Petitioner's mother testified that the BMW had been parked in the driveway of the house all day (RT 1330–31). She saw the car in the driveway at around 9:00 p.m. when nearly all the guests had left the party (RT 1331). The Bermudez declaration and the declarations of Arlene and David Perez demonstrate only that other witnesses existed with essentially the same information already gathered and presented by defense coun-

sel. In this way, even if defense counsel knew of Bermudez and petitioner's other siblings, his failure to call them as witnesses was not unreasonable where what they would have testified to was competently presented to the jury through other credible witnesses.

■ Finally, petitioner contends that defense counsel failed to obtain a Burger King surveillance tape that would have corroborated petitioner's claim that he was in the restaurant at the time Hernandez was shot. Petitioner, however, concedes that "it is . . . impossible to demonstrate prejudice" under *Strickland* by virtue of this alleged error alone (Trav.27). Accordingly, this order need not further analyze this point.

### C. Failure to Establish that Another Person Committed the Assault.

■ Petitioner contends next that defense counsel provided ineffective assistance insofar as he failed to investigate allegations that another person committed the assault for which petitioner was charged and convicted. The standard for reasonable investigation applies to this claim. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Counsel's duty to investigate, however, is dependent on the facts known. *Ames v. Endell,* 856 F.2d 1441, 1444 (9th Cir.1988). This order holds that defense counsel was not ineffective on this score.

■ Petitioner presented this claim to the state appeals court armed with the declaration of Monico Lopez. The post-conviction declaration, prepared in December 1997, identified Jose Villanueva, also known as Chicken Bone Tone, as the assailant rather than petitioner. Villanueva allegedly looked like petitioner (Pet.Exh. 15). According to Lopez, between 6:30

and 7:00 p.m. on April 16, 1995, Villanueva, in a black BMW, drove up to him as he stood on the sidewalk, spoke of a "punk up on Pope and Brunswick," showed Lopez a gun, and then said "I'm going to go handle this" (*id.* at 14). Lopez purportedly shared this information with petitioner's lawyer, although Lopez failed to specify *when* he did so (*id.* at 15). The state appeals court rejected petitioner's claim that defense counsel's failure to call Lopez as a witness at trial rendered his assistance ineffective:

> [Petitioner] further contends that his trial counsel was ineffective for failing to call Monico Lopez who could have testified that Jose Villanueva committed the shooting. The record demonstrates that counsel did not become aware of Lopez until after the trial. Indeed, counsel filed a second new trial motion based on newly discovered evidence in light of Lopez's information. Trial counsel was not ineffective for not calling Lopez as a witness when he was unaware of his existence.

(Opin.15). As there was nothing in the record to suggest that defense counsel knew of Lopez at the time of trial, the conclusion of the state appeals court was reasonable.

 Petitioner, however, contends that defense counsel was ineffective because he knew of Villanueva at the time of trial aside from any testimony of Lopez. In his own declaration, petitioner alleged that in June 1995, Villanueva visited him at the San Bruno County Jail, accompanied by Jim Ford (Pet.Exh. 6). During the visit, Villanueva purportedly confessed that "he was the one who shot at John Hernandez on Easter Sunday," providing the following sequence of events (*ibid.*). Villanueva supposedly "had some words with some dude

in a blue Prelude" and saw "the guy park up by Pope and Brunswick Streets" (*ibid.*). Villanueva then picked up Rick Adams from a nearby liquor store and while driving back to where the blue Prelude had parked saw Monico Lopez standing on the street. Villanueva showed Lopez a gun and said he was going to go "'handle his business' up on Pope and Brunswick Streets" (*ibid.*). Villanueva purportedly asked petitioner that day at the jail "to give him a year before he turned himself in, so he could save his money" (*id.* at 6–7).

After this conversation with Villanueva, petitioner purportedly told defense counsel "I knew who the shooter was and that he had asked me for a year" and that he was willing to testify if Villanueva did not come forward in time (*id.* at 7). Petitioner's declaration, however, did not specify *when* this conversation with his lawyer had taken place, if it had happened at all. The declaration was insufficient on its face in other respects. Petitioner stated that he merely told counsel that he "knew who the shooter was." Petitioner did not say that he told counsel that the shooter was Villanueva or "Chicken Bone Tone" (as he was apparently known in the neighborhood). The declaration further failed to confirm that petitioner told counsel of Ford, who purportedly accompanied Villanueva to the jail, or Adams or Lopez, whom Villanueva mentioned in his purported confession. Had petitioner identified any of these individuals, defense counsel could have been alerted of the need to investigate.

Faced with this dilemma, petitioner submitted a second declaration to the state appeals court in which he claimed to have spoken with defense counsel about Villanueva's confession on two separate occasions.[2] The first discussion was "in or

---

**2.** Petitioner labeled this second declaration a "rebuttal" declaration. It was prepared and submitted in the state habeas proceeding when respondent in its answer questioned the

sufficiency of petitioner's original declaration which, as mentioned, failed to specify when he had actually spoken with trial counsel about Villanueva.

about June of 1996, when Chicken Bone Tone ... visited me in jail, accompanied by Jim Ford" (Pet.Exh. 75).[3] At that time, petitioner again allegedly told defense counsel that he knew who had shot at Hernandez (*ibid.*). Significantly, however, he failed to state in his declaration that he had given defense counsel Villanueva's name, or otherwise referred to him by his moniker. Petitioner then allegedly met with defense counsel again after petitioner had learned that Chicken Bone Tone had been killed (*ibid.*). At that time, petitioner supposedly told counsel "all the details of Chicken Bone's confession" and that he wanted counsel to "obtain investigation to corroborate that Chicken Bone had been the one who had shot at John Hernandez on Easter, 1995" (*id.* at 75–76). The state appeals court found that petitioner's "self-serving and contradictory declaration regarding evidence his counsel failed to investigate or present is insufficient to support his claim of inadequate representation" (Opin.7–8). This order agrees.

Self-serving statements are often insufficient to overcome the presumption of validity accorded to state convictions. *See Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir.2002). With petitioner's declarations to the side, the state appeals court had nothing before it to support petitioner's contention that defense counsel knew of Villanueva at the time of trial. The state appeals court was reasonable in concluding that this was not enough to warrant a finding of ineffective assistance.

**D. Failure to Establish that Another Person was Driving a BMW Similar to Petitioner's BMW in the Neighborhood at the Time of the Assault.**

Petitioner claims that counsel was ineffective for failing to establish that Rick Adams, who lived in petitioner's neighborhood, owned a BMW similar to petitioner's and lent that BMW to Villanueva for a period of time which included the night of the shooting. Petitioner contends that defense counsel knew about the other car since "Rick Adams gave me two pictures of it in August 1996, and I gave those to [defense counsel] the same month" (Pet. Exh. 7). With these photos, petitioner contends defense counsel failed to investigate the possibility that Adams's BMW was the BMW used by Villanueva. The state appeals court rejected the claim:

> [Petitioner] also faults his trial counsel for not calling several witnesses who could testify that another BMW owned by Rick Adams was present in the neighborhood at the time and place the shooting occurred. According to [petitioner], Adams was a close friend of Villanueva. As discussed above, however, trial counsel was not aware of Villanueva at the time of trial. And, there was no evidence linking Adams or his BMW to the incident. Thus, any evidence pertaining to Adams's BMW was irrelevant.

(Opin.15) (citations omitted). Based on the evidence presented, the state appeals court's finding was reasonable. Petitioner did not claim he told defense counsel that Villanueva had driven Adams's BMW the night of the shooting. As mentioned,

---

**3.** Petitioner's declarations are inconsistent with regard to the date of Villanueva's alleged visit. His first declaration stated that he first talked with Villanueva in June 1995. His rebuttal declaration stated that the same occurred in or about June 1996. No explanation is given to explain the inconsistency. This order assumes the first declaration was accurate and the second included a mere typographical error.

there was no evidence showing that defense counsel was aware of Villanueva at the time of the trial. Neither did Adams, for his part, confirm that Villanueva had driven his BMW on the night of the shooting, just that he had lent it to Villanueva during that time (Pet.Exh. 68). This is particularly curious, since Adams was purportedly with Villanueva when Hernandez was assaulted, at least according to petitioner's rendition of Villanueva's "confession." Moreover, contrary to petitioner's claim that Adams personally gave him the two photos of the second BMW, Adams claimed to have given them to petitioner's investigator (*ibid.*). Adams, however, failed to specify when the photos were allegedly given to the investigator or whether defense counsel ever received them. As such, the record as to this claim does not support a finding of ineffective assistance.

### E. Failure to Obtain Petitioner's Informed Consent Not To Testify.

█ Petitioner contends that defense counsel deprived him of his right to testify in his own defense. The Fourteenth Amendment, of course, secures the right of a criminal defendant to testify on his own behalf. *Ferguson v. Georgia*, 365 U.S. 570, 602, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). The Supreme Court has held that certain restrictions on that right are unconstitutional. *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). But trial lawyers have a duty to counsel defendants whether or not to exercise that right. The state appeals court found that petitioner decided not to testify at trial based upon advice he received from counsel.

█ In support of its finding, the state appeals court referred to a letter petitioner had sent to the trial court in which he stated "belive [*sic*] me I wanted to take the stand[,] but was advised not to" (Opin.17). In his original habeas declara-

tion, petitioner further stated that he was only *willing* to testify (Pet.Exh. 7). It was not until his second declaration that petitioner asserted that he insisted on testifying and "was shocked" when defense counsel did not call him to the stand (*id.* at 76). Viewing petitioner's more-recent declaration as self-serving, the state appeals court was justified in rejecting petitioner's claim.

Moreover, petitioner presented no evidence to show that defense counsel's decision not to call him as a witness was unreasonable, especially given that his prior criminal record could have been used to impeach his testimony. *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir.2000). Had petitioner taken the stand, the jury certainly would have heard about petitioner's felony convictions for robbery, vehicle theft and assault (CT 4–6, 105–14). The decision not to call petitioner to the stand was a reasonable trial tactic. Accordingly, the state appeals court's finding that petitioner failed to support his claim of ineffective assistance of counsel was reasonable in light of the evidence presented.

### F. Failure to Inform Petitioner That His Case Was a Three–Strikes Case.

Petitioner claims that his counsel failed to snap up an erroneous plea-bargain offer. The case was charged as a three-strikes case. At the preliminary hearing, however, the district attorney expressed his belief that it was a one-strike case. He offered petitioner the opportunity to plead no-contest in exchange for a fourteen-year sentence (Pet.Exh. 9). Defense counsel noted that "[t]his puts me in a difficult position. I can surely discuss it, but we've not been in a situation where we were talking about a one-strike settlement up to today" (RT 3). The court granted a short recess to allow defense counsel to advise petitioner as to what was happening. Pe-

titioner claims that he asked counsel if his was a three-strikes case and counsel said no (Pet.Exh. 9). Defense counsel, however, purportedly told petitioner "that [fourteen years] was too much time, that I had no choice but to go to trial" (*ibid.*). Furthermore, counsel allegedly never informed him that if he lost the trial he could get life in prison. Petitioner stated that "if [defense counsel] had told me if I lost at trial I would get life, I would have asked for a few days to think about the offer, and I would probably have taken the [fourteen] years based on the weapons possession, even though I did not do the shooting" (*ibid.*).

 The decision to accept or reject a plea bargain offer is an important one to which the right to effective assistance of counsel attaches. *Turner,* 281 F.3d at 879. While counsel is not required to accurately predict the outcome of a trial, he is required to provide the defendant with the tools needed to make an intelligent decision about an available plea bargain. *Id.* at 881. In assessing whether counsel's conduct fell below the objective standard of professional conduct required by *Strickland,* the question is not whether counsel's advice was "right or wrong, but ... whether that advice was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). A defendant must show that counsel committed "gross error." *Id.* at 772, 90 S.Ct. 1441.

 This order need not resolve whether the state appeals court erred in determining that defense counsel failed to inform petitioner of the three-strikes status of his case. Nor does the potential impact of such error, or whether petitioner could have been expected to make an intelligent decision about the plea offered to him need to be resolved. The reason is because in addition to showing that counsel

erred, *Strickland* requires that petitioner demonstrate that the error caused him prejudice. In other words, petitioner must show that but for counsel's errors, he would have pleaded guilty and would not have proceeded to trial. *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

 Petitioner's own declaration is the only evidence provided to support these allegations. As stated, self-serving statements are often insufficient to overcome the presumption of validity accorded to state convictions. *Turner,* 281 F.3d at 881. In this case, once the prosecutor realized his error, he naturally would have withdrawn the plea offer. It may have been reasonable, therefore, for defense counsel not to raise the issue earlier. Nevertheless, it is telling that petitioner did not speak up about his desire to accept the prosecutor's "one-strike" offer until years later when he filed for habeas review. *See Riggs v. Fairman,* 178 F.Supp.2d 1141, 1149–50 (C.D.Cal.2001) (noting that "[t]he most persuasive evidence of what Petitioner probably would have done had he been advised properly, however, consists of what Petitioner *actually did* after he was advised properly: he attempted to recapture the lost plea opportunity ... he expressed, long before trial, in and out of court, his desire to accept the lapsed offer") (italics in original).

Furthermore, petitioner does not allege that his counsel misunderstood the consequences of the actual charges or penalties he was facing. Rather, petitioner maintains that the prosecutor was mistaken and that his counsel should have exploited its error. In determining the "reasonable probability" that petitioner would have pled guilty, this order must consider that in all likelihood the government would have realized its own error. At the preliminary hearing, the prosecutor on the

case noted that while his review indicated that this was a first-strike case, he had just been handed the case a few days earlier (RT 1–3). Just as defense counsel understood this case to be a three-strikes case, it is likely that the prosecutor, after further review, would have concluded that this was indeed a three-strikes case. It is reasonable to assume that petitioner's opportunity to accept the plea would not have remained available. Thus, he would not have been able to hold onto the mistaken offer. In the "few days" that petitioner now says he would have taken to think it over, the prosecutor would surely have realized his error and withdrawn the offer. Moreover, though not dispositive, it is further relevant that since petitioner maintained his innocence (and still does) it is likely that the court would not have been able to accept his guilty plea. Accordingly, this order finds that petitioner is unable to demonstrate prejudice from any alleged error to improperly advise him to reject the plea offer. Since petitioner cannot demonstrate that he would have been able to plead guilty to a one-strike case, relief is not due.

### G. Failure to Gather and Present Evidence to Support Two Motions for New Trial.

 In all, three motions for new trial were filed in the trial court. Defense counsel filed two new-trial motions on petitioner's behalf, on March 4, 1997, and October 7, 1997, respectively. Each motion was denied. Petitioner does not here complain per se of the assistance he received on either of these two motions. Rather, petitioner focuses on the third new-trial motion filed by substitute counsel on December 19, 1997. Petitioner argues that defense counsel was ineffective because he failed to present the evidence later presented by substitute counsel on the third new-trial motion. At bottom, petitioner contends the evidence existed

the whole time and defense counsel was ineffective for not finding it sooner. The state appeals court denied this claim. It stated that:

> Finally, trial counsel was not ineffective for failing to present the evidence that substitute counsel submitted in support of [petitioner's] new trial motion. [Petitioner] has not shown that this evidence, allegedly newly discovered, would have been available to trial counsel prior to his withdrawal from the case. In any event, [petitioner] has not demonstrated that any omissions regarding the new trial motions would reasonably have led to a different result. In sum, [petitioner] has failed to show ineffective assistance of counsel

(Opin.17).

Substitute counsel in this case moved for new trial on May 7, 1998. The following evidence was submitted in support of the motion. The victim John Hernandez, in a declaration dated May 2, 1998, stated that he was now "not sure who was the person who shot at me on that occasion." To assess the veracity of this version of events, Hernandez had taken a polygraph examination on April 24, 1998. According to Hernandez, however, the prosecutor threatened him with perjury if he changed his testimony. Petitioner submitted a declaration by a polygraph expert who stated that Hernandez's polygraph results could have been negatively affected by a threat of prosecution. David Anders, an acquaintance of Hernandez, stated that Hernandez had indeed confided in him that he was now not sure who had shot at him on April 16, 1995. Petitioner also submitted a second declaration from Monico Lopez. As opposed to Lopez's first declaration (which defense counsel had submitted in support of his second motion for new trial), this declaration clarified that he witnessed Villanueva commit the assault on April 16,

1995, rather than Easter Sunday two or three years ago (CT 442–58). The instant new-trial motion was denied May 22, 1998, because "[m]ost of the declarations are conclusory and the Court finds that there is no basis for a new trial in this matter" (RT 5/22/98 at 15).

The above evidence does not warrant federal habeas relief. Petitioner provided no evidence that defense counsel could have obtained declarations from Hernandez or Anders regarding Hernandez's recantation before December 19, 1997, when he was replaced by substitute counsel. Indeed, according to Anders, Hernandez did not tell him he was unsure who shot him until March 25, 1998. Hernandez did not take a polygraph test until April 24, 1998. Moreover, defense counsel did present a declaration from Monico Lopez to support the second motion for new trial. Defense counsel was not ineffective for failing to gather evidence that did not exist at the time he was attorney of record.

■ Moreover, even if counsel should have gathered the Hernandez and Anders declarations, petitioner has not demonstrated a reasonable probability of a different outcome. As mentioned, this evidence was presented to and considered by the trial court during the third motion for new trial. The trial court denied the motion finding that the post-trial declarations were not credible. The state appeals court agreed:

> The primary focus of the motion was Hernandez's declaration recanting his trial testimony that [petitioner] shot him. In his declaration, Hernandez stated that he was "not sure" who shot him and that the police and district attorney threatened him after he changed his testimony. [Petitioner] also submitted a declaration by David N. Anders that averred that Hernandez told him that he was not sure that [petitioner] was the shooter and a declaration by a

polygraph expert that opined that Hernandez's polygraph results could be negatively affected by a threat of prosecution.

\* \* \* \* \* \*

Here, the trial court found that the new evidence was not credible. We cannot conclude that the trial court abused its discretion in so finding. Hernandez positively identified [petitioner] as the shooter at trial. In his declaration recanting that testimony, he said only that he was not sure, not that [petitioner] was not the shooter. And, a polygraph examiner concluded that Hernandez was lying when he said that he was not threatened to change his testimony. Moreover, evidence submitted in opposition to the new trial motion showed that Hernandez told a police investigator six months after the verdict that [petitioner] had threatened him, but that he was not changing his story and that he told the truth at trial.

\* \* \* \* \* \*

The trial court further did not abuse its discretion in rejecting the declaration of Monico Lopez. Lopez filed an earlier declaration in support of [petitioner's] second new trial motion in which he stated that on an Easter Sunday two or three years ago, he saw Jose Villanueva, also known as Chicken Bone Tone, in the vicinity of the shooting between 6:30 to 7:00 p.m. in a black BMW. Villanueva showed Lopez a gun, telling him that he saw a punk on Brunswick that he was going to handle. Lopez also declared that Villanueva looks like [petitioner]. Villanueva died several months before [petitioner] filed his second new trial motion. In support of his third new trial motion, [petitioner] proffered a declaration by Lopez in which Lopez repeated the earlier declaration but specified the exact date he saw Villanueva as

Easter Sunday, April 16, 1995. The trial court justifiably denied the new trial motion based on this evidence. It was not newly discovered evidence and there was no showing made as to why this evidence could not have been discovered and produced at trial.

(Opin.8–10). Against this record, it was reasonable for the state appeals court to reject petitioner's claim that he would have been acquitted had defense counsel discovered and presented this evidence sooner. Since petitioner failed to show sufficient prejudice, federal habeas relief is not warranted.

■ Finally, to the extent petitioner argues that the aggregate of defense counsel's aforementioned alleged errors rendered counsel's assistance constitutionally ineffective, this argument necessarily fails. Because this order finds that defense counsel did not err as petitioner alleged, it need not analyze whether the cumulation of the alleged errors may have prejudiced the outcome of the trial.

### H. Petitioner is Not Entitled to an Evidentiary Hearing.

■ In relation to all of the above claims, petitioner asserts that he is entitled to an evidentiary hearing on his claims of ineffective assistance of counsel. He maintains that material facts are left undeveloped because defense counsel did not submit a declaration explaining his decisions at trial. "A habeas petitioner is entitled to an evidentiary hearing if: (1) the allegations in his petition would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir.2001).

The allegations set forth by petitioner in each of his ineffective assistance of counsel claims are insufficient to show that counsel's representation fell below an objective standard of reasonableness and that counsel's errors were sufficiently serious to deprive him of a fair trial. The state appeals court reached the same conclusion, finding that the state petition failed to state a prima facie case for relief (Opin.7–8). Thus, petitioner's allegations would not entitle him to relief under the standard established by *Strickland*. Accordingly, an evidentiary hearing is not required to resolve any fact issue.

### 3. RIGHT OF CONFRONTATION CLAIM.

Petitioner's second constitutional claim asserts that the trial court deprived him of his right to effective confrontation and cross-examination of the lead prosecution witness, the victim John Hernandez. He contends the trial court improperly limited the scope of impeachment. The relevant facts are as follows.

■ The prosecutor did not disclose that Hernandez had a criminal record until jury selection was nearly completed. Hernandez, for example, had been convicted of petty theft in 1979, arrested for hit-and-run incidents in 1979 and again in 1980, and convicted of weapons possession in 1980 (CT 158–65, 170–71; RT 95–96). The trial court held a hearing under California Evidence Code Section 402 to determine whether to impose sanctions against the prosecutor for its late disclosure. The prosecutor's investigator and Hernandez were examined outside the presence of the jury. The investigator testified that while he told the prosecutor that Hernandez had no record, he could not remember if he asked Hernandez about his prior arrests or convictions. Moreover, the investigator never ran a rap sheet, something he had not told the prosecutor. Hernandez testified that he had only recently informed the prosecutor that he "had some stuff when I was under 18" (RT 90). He testified that he had "just found out" that he had "adult"

convictions (*ibid.*). Hernandez claimed to have forgotten about nine adult arrests. He said that he thought he had sustained the adult arrests as a juvenile, but then admitted that he had been arrested when he was "18 or 19" (*id.* at 92).

The trial court concluded that the prosecutor had failed to follow the discovery rules. Defense counsel moved for dismissal, which was denied. Defense counsel then asked that Hernandez be excluded from testifying, for full discovery into Hernandez's criminal history and that the jury be admonished that the prosecutor had failed to disclose relevant information and that Hernandez's testimony was "willfully false" (RT 256–57). The prosecutor produced a copy of Hernandez's rap sheet to the court.

After opening statements and before Hernandez was called to testify, defense counsel renewed his motion for dismissal and evidentiary sanctions based on the prosecutor's failure to provide Hernandez's criminal record. Defense counsel also requested that he be permitted to examine Hernandez as to his misdemeanor conduct involving moral turpitude, and his denial of an adult record. The court denied the motion to dismiss and the motion to preclude Hernandez from testifying. The court ruled that only "convictions for crimes of moral turpitude" could be introduced. As such, for purposes of impeachment, defense counsel was allowed to question Hernandez about the 1979 conviction for petty theft and a 1980 misdemeanor conviction for failure to yield to authorities (RT 417–18).

At the completion of Hernandez's testimony, defense counsel learned that Hernandez had been convicted in 1985 for driving under the influence as well as for being under the influence of PCP. Defense counsel sought to recall and impeach Hernandez in light of this additional evidence.[4] Counsel again requested that he be allowed to impeach Hernandez with his denial of an adult record. The court took the requests under submission, claiming it wanted to "think about this overnight" (RT 1129). The court, however, never ruled on the motions, and Hernandez did not make any further appearances in the case. Nevertheless, prior to closing argument, the trial court told the jury that "there was some testimony given by Mr. Hernandez out of your presence which at this time I will read to you ..." (RT 1461). The court read from the transcript of the Section 402 hearing. Beginning with the prosecutor's examination of Hernandez's criminal history, the trial court proceeded:

Question: And what did you tell me, sir, in that regard?

Answer: That I had some stuff when I was under 18.

Question: What were your exact words if you remember?

Answer: When I was a minor or something like that. ·

Question: Did you use the word juvenile?

Answer: Yes, juvenile.

Question: Have you had adult arrests?

Answer: Yes. I just found out.

Question: Have you had adult convictions?

Answer: Yes.

---

4. Petitioner concedes that Hernandez's alleged PCP use would only have been relevant to show that Hernandez was under the influence while testifying, when the shooting at issue occurred, or that his mental faculties were actually impaired by the habit. There is no dispute that defense counsel had no such evidence at the time he sought to recall Hernandez to testify. Petitioner maintains, however, that this was the fault of the prosecutor, who failed to comply with discovery requests.

Question: All right. Why did you indicate to me last week that you had only a juvenile background?

Answer: I thought it was around when I was 17 years old. I thought it was pretty close.

(RT 1461–62). The trial court then read defense counsel's cross-examination on the issue:

Question: In fact, you have an adult record, right?

Answer: Yes.

Question: Arrests after you were 18 years old, right?

Answer: Yes, one year after.

 * * * * * *

Defense: You were not 18, but 19 or 20.

Hernandez: 18 or 19. It was a long time ago.

Defense: How old are you now?

Hernandez: Thirty-five.

Defense: When is your birthdate?

Hernandez: March 31, 1961.

(RT 1462). The court finally admonished the jury that "Mr. Hernandez did have a conviction in 1985 for a minor offense. This evidence is not being admitted on the issue of that conviction but rather as being admitted with respect to the testimony given in this Court outside your presence to be considered by you if at all with respect to his credibility" (RT 1462–63).

The crux of petitioner's argument is that defense counsel was unable to meaningfully challenge Hernandez's credibility because he was not permitted to recall him for cross-examination or introduce the entire transcript of the cross-examination that occurred at the Section 402 hearing. Either of these methods, he contends, would have persuaded the jury that Hernandez committed perjury. Petitioner claims that the portion of Hernandez's testimony that was read to the jury allowed

jurors to infer that Hernandez had been merely confused by whether his priors were part of his juvenile record—not that he was lying. Petitioner argues that the jury should have been told of Hernandez's failure to recall nine adult arrests.[5]

The state appeals court found that the trial court properly exercised its discretion under California Evidence Code Section 352 to limit the cross-examination of Hernandez. The state appeals court reasoned:

While [petitioner] was limited to impeaching Hernandez with two misdemeanor convictions, the jury learned of a third 1985 conviction through the court's admonishment to the jury. The jury was further informed of Hernandez's inconsistent testimony at the Evidence Code [S]ection 402 hearing inasmuch as that testimony was read to the jury. The jury thus learned that Hernandez had lied when he testified that he had no adult record. In light of the impeachment evidence of Hernandez already before the jury, the court properly limited further cross-examination of Hernandez on the issues of his adult arrests. It necessarily determined in the exercise of its discretion that the additional proffered areas of impeachment would be cumulative and would result in an undue consumption of time. For the same reasons, the court's exclusion of any evidence of Hernandez's possible PCP use was not in error. First, [petitioner] proffered no evidence that Hernandez was convicted of being under the influence of PCP, only that he was charged with that offense in 1985. Second, there were serious problems of proof on the PCP issue notwithstanding the relevancy of the evidence. [Petitioner] offered no evidence indicating that Hernandez was under the influence of PCP while

5. The specific details surrounding these nine alleged adult arrests are not provided. Indeed, the full extent of Hernandez's criminal background is unclear from the record.

testifying, when the incident at issue transpired, or that his mental faculties were actually impaired by the use. (See *People v. Smith* (1970) 4 Cal.App.3d 403, 412, 84 Cal.Rptr. 412.) On this record, there is no basis for concluding that the trial court abused its discretion in limiting the cross-examination of Hernandez. (Opin.12).

This order finds that the trial court's decision to prohibit recalling Hernandez or reading the entire hearing transcript to the jury did not result in denial of petitioner's right to confrontation. The portion of the transcript that the trial court read revealed that Hernandez had testified that he only had juvenile convictions, when in fact he had adult convictions. Petitioner also was permitted to impeach Hernandez with two of his misdemeanor convictions, and the trial court also admonished the jury that Hernandez also had a conviction in 1985 for a minor offense. Thus, the jury had enough information from which it "could appropriately draw inferences." *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness") (citation omitted).

In addition, since Hernandez was 35 years old at the time of his testimony, that he did not accurately recall all of his arrests and the exact ages at which they occurred could well have been an ordinary failure of recollection. It is true, as petitioner points out, that the trial court was "disturbed about the credibility of anyone who doesn't remember nine arrests since they were 19" (RT 409). Trial courts, however, retain wide latitude under the Confrontation Clause "to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witnesses' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431. The trial court here acted appropriately under its broad discretion to make a judgment as to what evidence to permit in this circumstance. Defense counsel's requests would have been largely repetitive and would not have materially changed the outcome of petitioner's trial. Thus, any error (if there was one) appears to have been harmless. *Id.* at 680, 106 S.Ct. 1431. In sum, the trial court here did not commit reversible error. Petitioner's right to confrontation was not violated.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is hereby DE-NIED. The Clerk shall CLOSE the file.

**IT IS SO ORDERED.**